UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                                                  :
CATHY WATKINS,                                    :
                                                  :
                        Petitioner,               :
                                                  :        05 Civ. 477 (GEL)
        -against-                                 :
                                                  :        **OPINION AND ORDER**
ADA PEREZ,                                        :
                                                  :
                        Respondent.               :
                                                  :
--------------------------------------------------------------x

Lloyd Epstein, Epstein & Weil, New York, New
York, for Petitioner.

Robert T. Johnson, District Attorney, Bronx, New
York (Nancy D. Killian and Joseph N. Ferdenzi,
Assistant District Attorneys, of counsel), for
Respondent.


GERARD E. LYNCH, District Judge:

        Cathy Watkins, an inmate at Bedford Hills Correctional Facility, petitions for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, arguing (1) that she received ineffective assistance

of counsel at her state trial; (2) that the voice identification procedure used by the police was

unconstitutional; (3) that the prosecutor engaged in various misconduct at trial; (4) that the trial

court improperly excluded evidence submitted by petitioner; (5) that the trial court erroneously

gave a missing witness charge; (6) that the line-up identification was the fruit of an illegal

detention; (7) that the trial court improperly failed to order the prosecution to disclose alleged

Rosario material; and (8) that her sentence was excessive.  For the reasons that follow, the

petition will be denied.

**BACKGROUND**

On October 24, 1997, after a New York jury convicted Watkins of murder in the second degree, N.Y. Penal Law § 125.25(3), petitioner was sentenced to a prison term of twenty-five years to life.  At trial, the State presented evidence to show that, on January 19, 1995, Watkins lured New Harlem Cab Company driver Baithe Diop to his death by calling for a cab to pick her up and drive her to the Bronx, where petitioner, along with four others, robbed and murdered him.  (Killian Aff. ¶ 5.)  Only facts relevant to the present petition will be recited here.

I.  The Investigation

    A.    The Initial Arrest and Interrogation

On January 19, 1995, Detective Michael Donnelly was assigned to investigate the murder of Baithe Diop, which had occurred earlier that day in the Bronx.  (Tr. 857.)  On that date, Det. Donnelly interviewed Nicole Diop, a dispatcher at the New Harlem Cab Company, who informed the detective that the deceased's last fare was a frequent customer who identified herself as "Yvette."  (Id. 681, 687.)  Det. Donnelly advised New Harlem's personnel to transport "Yvette" to the police precinct if she called again for a cab.  (Id. 748.)

On January 21, 1995, petitioner was on her way to a party when her cab was stopped by the police and she was taken in for questioning about the murder.  (Id. 1330.)  Although petitioner was not formally arrested or charged with any crime, the trial court found at a Huntley/Wade hearing that the circumstances surrounding her detention created a de facto arrest. See People v. Watkins, No. 1086/95, at 8 (N.Y. Sup. Ct. filed Sept. 3, 1997); see, e.g., Discussion, Section VII, infra.  However, Det. Donnelly did not administer Miranda warnings to petitioner, considering her at the time to be only a witness to, and not a suspect in, the homicide.

(Tr. 750-51.)

At the precinct, petitioner denied in a written statement that she had taken a cab on January 19, claiming to have been home with her boyfriend, Andrew Peters.  (Id. 751-52.) Petitioner also agreed to be photographed at the precinct.  (Id. 754.)  Petitioner was allowed to leave, and agreed to come to the 43rd Precinct on the following evening with Peters.  (Id.)

B.    The Voice Identification

On the following evening, petitioner was again interviewed by Det. Donnelly.  (Id. 757.) As part of his investigation, Det. Donnelly provided petitioner with a telephone number to call, and instructed her to call the number and pretend to order a cab.  (Id. 760.)  The number corresponded to a telephone line in the lieutenant's office where Nicole Diop was located.  (Id. 758.)  Ms. Diop had been instructed to answer the phone in the manner she would as a dispatcher with the New Harlem Cab Company.  (Id.)  Ms. Diop confirmed that the voice she heard on the phone and that of "Yvette" belonged to the same person.  (Id. 762.)  Petitioner denied having ordered a cab on the night of the murder, and was again allowed to leave.  (Id. 763.)

C.    The Identification, Formal Arrest, and Line-up

On February 1, 1995, Det. Donnelly interviewed Miriam Tavares, a witness to the shooting.  (Id. 492.)  Det. Donnelly showed Tavares the picture of petitioner taken on January 22, and Tavares identified petitioner as a participant in the shooting.[1]  (Id. 494.)  On February 16, 1995, petitioner was arrested in the hallway outside her apartment.  (Id. 784.)  The next day,

_____

[1] There is some dispute as to whether Tavares was shown a single picture or a photo array.  (Compare Tr. 494 ("They showed me approximately six faces of different women") and id. 767 (same), with id. 1188-89 ("[Tavares] only viewed one photograph.").)  See Background, Section II.B, infra.

Tavares identified petitioner in a line-up. (Id. 497, 787.)

II. The Trial

A jury trial was held in the New York State Supreme Court, Bronx County, from September 4-26, 1997.

     A.     Pre-Trial Evidentiary Rulings

Before trial, petitioner sought to suppress her January 21 written statement and photograph as the fruit of an unlawful arrest. (See Resp. Ex. 15 at 7.) In addition, petitioner argued that, had the photograph taken of her on January 21 been properly suppressed, Tavares would not have been able to identify her from the photo as a participant in the crime, the police would not have had probable cause to arrest her, and the line-up could not have been conducted; thus, petitioner argued that the line-up identification of her by Tavares should have been suppressed as the further fruit of her initial unlawful arrest. Although the court found that petitioner's January 21 detention was a de facto arrest, it denied suppression of the statement and photograph due to "intervening events" between the arrest and the statement and photograph which "served to dissipate the taint of the prior unlawful police conduct." (Id.) Accordingly, the statement, photograph and line-up identification were not suppressed.

Before trial, petitioner also sought to suppress the January 22 voice identification, arguing that the procedure used by Det. Donnelly was unconstitutionally suggestive. (Id. 10.) The court found that the dispatcher was "sufficiently familiar" with petitioner's voice to "render her identification . . . confirmatory in nature." (Id. 12.) Thus, because the identification was based on familiarity and not on undue police suggestion, the court denied suppression of the voice identification. (Id.)

-4-

B.      Evidentiary Rulings at Trial

During trial, petitioner sought to introduce an audiotape of a conversation between Tavares and Joseph Lisi, an investigator hired by petitioner.  (Tr. 1266.)  According to petitioner, Tavares told Lisi that she had only been shown a single photograph of petitioner on February 1, and not a photo array.  (Id. 1268.)  However, the court denied petitioner's application, finding that the audiotape was cumulative to other evidence already submitted by petitioner and not in dispute.  (Id. 1270.)

In addition, after the first day of trial, the court was asked to inspect, in camera, a 31-page packet of "inter-office reports associated with homicide cases in the Bronx County D.A.'s Office."  (Id. 97.)  The court found that the reports were attorney work product, and returned them to the prosecutor.  (Id. 99.)

C.      Alleged Prosecutorial Misconduct

During trial, defense counsel objected to testimony elicited by the prosecutor from petitioner that she was detained pending trial.  (Id. 1355.)  At the ensuing colloquy, the prosecutor explained that he neither intended nor expected petitioner to present such testimony, and that the testimony had been inadvertently elicited.  (Id. 1368.)  After a mistrial motion was denied, the court agreed to give defense counsel's requested curative instruction that, although petitioner was in custody, that fact was irrelevant to the pending case.  (Id. 1374-75, 1449-51.)

During trial, the prosecutor also elicited testimony from petitioner and another defense witness, Jose Tolentino, about petitioner's boyfriend, Andrew Peters.  (Id. 1190, 1328-39, 1341, 1348-49, 1351, 1360.)  Among other information, the prosecutor elicited testimony about Peters's alleged criminal involvement in car thefts and drug dealing.  Defense counsel objected

to some, but not all, of the prosecutor's questions about Peters; some of the objections were

sustained (see, e.g., id. 1344, 1361), while others were overruled.  (See, e.g., id. 1342.)  In

addition, defense counsel objected to a portion of the prosecutor's summation, in which the

prosecutor connected Peters with petitioner and argued that Peters was the driving force behind

the homicide.  (Id. 1589.)  The court overruled the objection.  (Id. 1585.)

III.  Procedural History

On October 24, 1997, Watkins was sentenced to twenty-five years to life in prison.  On

November 29, 2001, the Appellate Division affirmed the conviction and sentence, People v.

Watkins, 733 N.Y.S.2d 70 (1st Dep't 2001), and on July 17, 2002, the New York Court of

Appeals denied leave to appeal.  98 N.Y.2d 703 (2002).  On October 10, 2003, Watkins

collaterally attacked her conviction under N.Y. Crim. Proc. Law § 440.10.  She argued, as she

does here, that she received ineffective assistance of counsel when defense counsel did not

adequately challenge the legality of her formal arrest pursuant to Payton v. New York, 445 U.S.

573 (1980).  By order of September 14, 2004, the court denied the § 440.10 motion both on the

merits and as procedurally barred.  (Resp. Ex. 12.)  The Appellate Division denied leave to

appeal that decision on November 30, 2004.  (Resp. Ex. 13.)  Watkins filed the present petition

for habeas corpus on December 8, 2004.[2]

---

[2] Watkins originally filed her petition for habeas corpus on August 21, 2003.  However, shortly thereafter, petitioner requested that her petition be withdrawn without prejudice, due to her pending § 440.10 claim.  (Resp. Ex. 8.)  The Court granted the requested relief, and the petition was withdrawn without adjudication on the merits.  Accordingly, Watkins's current petition is a re-filed, and not second or successive, petition.  See Slack v. McDaniel, 529 U.S. 473, 485-86 (2000).

**DISCUSSION**

I.  Timeliness Objection

As an initial matter, the District Attorney argues that petitioner's claims must be dismissed as untimely because her petition was filed more than one year after her conviction became final.  Petitioner argues that, upon application of the three-day extension provided by Federal Rule of Civil Procedure 6(e), her petition was timely.  Because the petition lacks merit, it is unnecessary to decide whether the petition was timely or determine whether Rule 6(e) is applicable under the circumstances presented here.

A prisoner challenging the constitutionality of her state conviction must file her federal habeas corpus petition within one year of her conviction's becoming final "by the conclusion of direct review or the expiration of the time for seeking such review."  See 28 U.S.C. § 2244(d)(1)(A).[3]  However, if petitioner applies for "State post-conviction or other collateral review," the statute of limitations is tolled while the application is pending.  Id. at (d)(2); see Carey v. Saffold, 536 U.S. 214 (2002).  Therefore, Watkins was required to file her habeas application within one year from the date on which her judgment of conviction became final, excluding any time during which a state application for collateral review was pending.

The New York Court of Appeals denied Watkins leave to appeal her conviction on July 17, 2002.  Watkins was allowed ninety days thereafter to seek certiorari from the U.S. Supreme Court.  See Zarvela v. Artuz, No. 97 Civ. 2393, 1999 WL 1487595, at *1 (E.D.N.Y. Dec. 3, 1999) (citing Sup. Ct. R. 13(1)), rev'd on other grounds, 254 F.3d 374 (2d Cir. 2001).

---

[3] There are "certain variations" to the point at which a conviction becomes final for purposes of the rule, Ross v. Artuz, 150 F.3d 97, 98 (2d Cir. 1998), none of which apply here.

Accordingly, her conviction became final on October 15, 2002.  Watkins then filed a § 440.10

motion on October 10, 2003, 360 days after her conviction became final.  The pendency of this

collateral attack on her conviction tolled the statute of limitations until leave to appeal the denial

of the motion was denied by the Appellate Division on November 30, 2004.  Watkins filed the

instant petition on December 8, 2004, eight days later.  The District Attorney argues that

Watkins's petition was thus filed 368 days after her conviction became final (excluding the

tolled period), thereby rendering the petition untimely.

However, petitioner argues that Federal Rule of Civil Procedure 6(e) renders her petition

timely.  Rule 6(e) provides that "[w]henever a party must or may act within a prescribed period

after service and service is made [by mail], 3 days are added after the prescribed period would

otherwise expire under subdivision (a)."  As Watkins was an inmate on November 30, 2004,

when the Appellate Division denied leave to appeal the § 440 decision, she was presumably

served with the Division's decision by mail; therefore, petitioner argues that "Federal Rule of

Civil Procedure 6(e) granted [her] an additional three days in which to make a timely § 2254

filing."  Zarvela, 1999 WL 1487595, at *1.  Thus, because 360 days had accrued when Watkins

filed her § 440 motion, petitioner argues that she had an additional five days after November 30,

2004, to file her habeas petition, plus three days to account for service by mail, bringing her total

allotment to 368 days.  Accordingly, Watkins argues that her petition was timely.

This Circuit has not definitively ruled on whether Rule 6(e) applies to the particular

circumstances of this case.  The plain language of Rule 6(e) does not appear to entitle a habeas

petitioner to an additional three days of filing beyond the one-year statute of limitations.  Rule

6(e) extends time periods that are determined by "a prescribed period after service."  The habeas

limitation period runs, insofar as relevant here, not from the time when petitioner is "serv[ed]" with any document, but from "the date on which the judgment becomes final."  28 U.S.C. § 2244(d)()1)(A).  Moreover, Rule 6(e) in context does not appear to be concerned with statutes of limitations.  As the First Circuit has noted, while Rule 6(e) "is centrally concerned with what a 'party' does . . . within the framework of an *existing* case," a statute of limitations "govern[s] the time for *commencing* [the] action."  Donovan v. Maine, 276 F.3d 87, 91 (1st Cir. 2002) (emphasis supplied).  See also Jackson v. Crosby, 375 F.3d 1291, 1294 n.5 (11th Cir. 2004) (Rule 6(e) cannot be applied when action must be taken within a certain period after entry of a judgment); Rouse v. Lee, 339 F.3d 238, 245-46 (4th Cir. 2003) ("[T]he mailbox rule does not extend the [§ 2254] limitations period.").

Although this Court finds the reasoning of these cases persuasive, disposing of this case on the basis of the statute of limitations appears imprudent.  After all, the issue is not one-sided. Both then-District Judge Raggi in Zarvela[4] and the Third Circuit have found that Rule 6(e) provides a habeas petitioner an additional three days beyond the one-year statute of limitations to allow time for petitioner to "learn" the "factual predicate" for her petition, as it is only when petitioner receives such information is she able to "exercise due diligence" by filing her petition. Wilson v. Beard, 426 F.3d 653, 664 (3d Cir. 2005).  See id. ("Due diligence does not require . . . psychic powers.").  Thus, if this Court ruled that Watkins's petition was untimely, the fact that reasonable jurists could and do differ about this issue would require issuance of a certificate of appealability, to permit our Court of Appeals to address the statute of limitations issue.  If the

---

[4] Zarvela was reversed on other grounds, 254 F.3d 374; the Circuit noted, but did not rule on the propriety of, the district court's application of Rule 6(e) to habeas petitions.  Id. at 378.

Second Circuit adopted the minority view of the issue, the matter could become ripe for Supreme

Court review, or be returned to this Court for a later ruling on the merits.  All of this would

consume substantial judicial resources, while the merits of the petition remained in abeyance.

For the reasons set forth below, however, Watkins's petition lacks merit.  Indeed, her

positions on the merits are so insubstantial that the Court will not issue a certificate of

appealability.  Therefore, deciding the timeliness of her petition is unnecessary to the disposition

of this case, as the petition must be denied regardless of whether it was timely, and doing so on

the merits is by far the more efficient course.[5]

---

[5] There is another reason for this Court's hesitance to dismiss Watkins's petition on
timeliness grounds.  Watkins filed her habeas petition pro se, and subsequently asked permission
to withdraw the petition to permit her to pursue her state post-conviction remedies with respect
to certain claims.  See note 2 supra.  The Court granted that request – perhaps incautiously, for in
doing so the Court may have permitted Watkins to fall into one of the many "obscure procedural
perils of habeas corpus," Zarvela, 254 F.3d at 381, that await the unwary petitioner.  When a pro
se habeas petition includes both exhausted and unexhausted claims (a "mixed petition"), the
Second Circuit held in Zarvela that a district court may (1) dismiss the entire petition without
prejudice; or (2) dismiss the unexhausted claims and stay the rest of the claims pending
exhaustion.  Id. at 381-82.  The Supreme Court later approved this conclusion.  Rhines v. Weber,
544 U.S. 269 (2005).  The Zarvela court further held that when a dismissal "could jeopardize the
timeliness of a collateral attack," a stay is the preferential course of action.  254 F.3d at 380.  The
stay should be conditioned on the petitioner pursuing state court remedies "within a brief
interval, normally 30 days after the stay is entered and returning to federal court within a
similarly brief interval, normally 30 days after a state court exhaustion is completed."  Id. at 381.

In this case, petitioner initially presented a mixed petition to the Court, and, at her
request, the Court dismissed the petition without prejudice.  However, because 360 days had
already elapsed since the entry of final judgment when petitioner filed her § 440 petition,
dismissal without prejudice "jeopardize[d]" petitioner's return to this Court, as she only had five
days remaining on the limitations clock to re-file her habeas petition.  Although the Court had
discretion as to whether to dismiss without prejudice or issue a stay, 254 F.3d at 382, the
"prefer[red]" course at the time Watkins initially filed her petition was to stay resolution of the
exhausted claims for a "reasonable" period of time to allow petitioner to return to state court.  Id.
at 381.  Had Watkins been aware of this option, and requested a stay, the Court should and
would have granted it, Watkins's timely petition would have remained in place, and there would
be no timeliness obstacle to considering her claims on the merits.  The Court should have seen
this possibility and either taken this course sua sponte or presented the option to Watkins.

II.  <u>The Ineffective Assistance of Counsel Claim</u>[6]

     A.      Procedural Objection

As a threshold matter, the District Attorney argues that petitioner's ineffective assistance of counsel claim must be dismissed as procedurally defaulted and untimely because the factual basis for that claim was available to petitioner when she appealed her conviction to the Appellate Division, but she waited until she filed her § 440.10 motion to raise it.  By failing to raise her claim of ineffective assistance at an earlier stage, the District Attorney argues, petitioner forfeited it.  (Resp. Mem. 11.)  Moreover, the District Attorney argues that because the state court ruled, as an alternative reason for denying petitioner's § 440.10 motion, that this claim was barred by her failure to raise the issue on "direct appeal" (Resp. Ex. 12 at 7), the denial of her ineffective-assistance claim rests on an independent and adequate state ground that precludes federal habeas review.  (Resp. Mem. 11.)  Once again, resolution of this procedural obstacle raises more difficult issues than the merits of petitioner's claim.

A federal court may not grant habeas relief where a state court's denial of a claim rests on an independent and adequate state-law ground, including failure to follow a state procedural rule requiring such a claim to be raised in a certain manner lest the defendant forfeit that claim. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-32 (1991).  But the adequacy of an alleged state

---

[6] Petitioner's ineffective-assistance claim appears in the habeas petition itself, but was not addressed by petitioner in her brief.  However, the petition incorporates by reference the brief submitted to the § 440 court, and the District Attorney responded to the argument.  Accordingly, the claim was fully briefed and is ripe for review by this Court. Although petitioner's brief in this Court lauds the conduct of defense counsel during trial (Pet. Mem. 2 ("Defense counsel did everything he professionally could to avert this travesty."), petitioner's ineffective-assistance claim relates to defense counsel's pre-trial conduct.  This statement thus does not reflect abandonment of her claim.

procedural bar is itself a question of federal law, Lee v. Kemna, 534 U.S. 362, 375 (2002); Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999), and "a [state] procedural bar will be deemed 'adequate' only if it is based on a rule that is 'firmly established and regularly followed' by the state in question."  Garcia, 188 F.3d at 77, quoting Ford v. Georgia, 498 U.S. 411, 423-24 (1991).

Here, the District Attorney argues that the § 440 court denied petitioner's collateral claim of ineffective assistance on the independent and adequate state-law ground that petitioner failed to raise it on direct appeal as required by N.Y. Crim. Proc. Law § 440.10.  (Resp. Mem. 11; Resp. Ex. 12 at 5-7.)  N.Y. Crim. Proc. Law § 440.10(3)(a) provides:

> 3.  Notwithstanding the provisions of subdivision one, the court may deny a motion to vacate a judgment when:
>
> (a)  Although facts in support of the ground or issue raised upon the motion could with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review of such ground or issue upon an appeal from the judgment, the defendant unjustifiably failed to adduce such matter prior to sentence and the ground or issue in question was not subsequently determined upon appeal.  *This paragraph does not apply to a motion based upon deprivation of the right to counsel at the trial* or upon failure of the trial court to advise the defendant of such right[.]

(Emphasis supplied).  Thus, by its terms, this subsection does not apply to "a motion based upon deprivation of the right to counsel," presumably including a motion based on ineffective assistance of counsel.  See Lopez v. Greiner, 323 F. Supp. 2d 456, 466 (S.D.N.Y. 2004).  Therefore, in general, post-judgment attacks on trial counsel's assistance should be made by a motion pursuant to N.Y. Crim. Proc. Law § 440.10.  See People v. Brown, 45 N.Y.2d 852, 853-54 (1978) ("[I]n the typical case it would be better, and in some cases essential, that an appellate

attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or post-conviction proceeding."); People v. Brown, 28 N.Y.2d 282, 287 (1971) (determination of ineffective assistance generally does "not lie within the compass of appellate review by a court limited to properly preserved questions of law"); see also People v. Gilbert, 745 N.Y.S.2d 155, 157 (1st Dep't 2002); People v. Lemma, 711 N.Y.S.2d 3, 3-4 (1st Dep't 2000) (both holding that ineffective-assistance claims properly should be raised by a post-conviction motion pursuant to § 440.10).

The § 440 court nonetheless denied Watkins's claim in part for failure to raise the ineffective-assistance claim on direct appeal (Resp. Ex. 12 at 5-7), arguably barring habeas relief under the independent and adequate state ground doctrine.  See Coleman, 501 U.S. at 729-30. But "an ineffective-assistance claim generally cannot be brought on a direct appeal based 'on the face of the record.'"  Lopez, 323 F. Supp. 2d at 466.  Accord Faulkenson v. Conway, No. 04 Civ. 0080, 2007 WL 160926, at *7 (E.D.N.Y. Jan. 10, 2007); Bell v. Miller, No. 05 Civ. 0663, 2005 WL 1962413, at *5 (E.D.N.Y. Aug. 12, 2005).  Moreover, petitioner's ineffective-assistance claim arguably was not even ripe until after her appeal was completed, as petitioner had argued on her direct appeal that the Payton point had been adequately preserved, so it was only after the Appellate Division rejected that argument that the basis for her ineffective assistance claim – the prior waiver or abandonment of her Payton claim – became apparent.  Watkins, 733 N.Y.S.2d at 71.

Although the state court concluded that "a careful inspection of . . . the record establishes [that] the "Payton" issue was withdrawn or abandoned" and not preserved (Resp. Ex. 12 at 6), the matter is not entirely free from doubt.  While perhaps the better course for counsel on

petitioner's initial appeal would have been to argue in the alternative that the point was preserved, or, if not preserved, that it was ineffective assistance for trial counsel to fail to preserve it, it is difficult to fault appellate counsel for aggressively arguing the position that one of his principal arguments had been properly preserved, or to find that that argument was entirely without merit.  (See Resp. Ex. 3 at 4-5.)

Moreover, the state court's first and principal rationale for denying petitioner's §440.10 motion addressed the merits.  (Resp. Ex. 12 at 3-5.)  Under Harris v. Reed, 489 U.S. 255 (1989), "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  Id. at 263 (citation omitted).[7]  In applying this rule, the mere existence of, or a passing reference to, a state procedural bar does not necessarily qualify as a clear and express statement; "the state court must actually have relied on the procedural bar as an independent basis for its disposition."  Caldwell v. Mississippi, 472 U.S. 320, 327 (1985); cf. Jones v. Stinson, 229 F.3d 112, 118 (2d Cir. 2000) (mere recitation of factual predicate for procedural default, without an express finding of such default, is insufficient to bar federal habeas review).

The District Attorney's position, in effect that this Court should defer to the state court's reading of the record, conclude that the basis for the ineffective assistance motion was apparent on the original state trial court record, and rule that the state court's reliance on procedural default as an alternative, independent ground for denying the motion, has considerable merit.

---

[7] Because the Appellate Division denied leave to appeal, the trial court's decision denying the § 440.10 motion is the last state judgment on the issues raised by petitioner's state court application for post-conviction relief.

Nevertheless, it again appears the more prudent course not to rely on a close procedural issue, but, like the Appellate Division and the § 440.10 court, to address the merits, which present a more straightforward basis for denying petitioner's claim.

      B.     Constitutional Standard

The Sixth Amendment right to counsel is the right to the effective assistance of counsel. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see also Evitts v. Lucey, 469 U.S. 387, 395-96 (1985).  To establish a violation of this right, a convicted defendant generally must show that counsel's "representation fell below an objective standard of reasonableness," and that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).  This is a heavy burden.  United States v. Diaz, 176 F.3d 52, 112 (2d Cir. 1999).

      C.     Standard of Review on Habeas

      A federal habeas court cannot grant relief based on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d); see Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring).  While the § 440 court correctly cited Strickland as governing law (Resp. Ex. F. at 3), its opinion also appears to apply New York's distinct standard for assessing ineffective-assistance claims.  (Id.)  The New York constitutional standard, see People v. Baldi, 54 N.Y.2d 137, 147 (1981), however, is

not "contrary to" the federal constitutional standard set forth in Strickland.[8]  Eze v. Senkowski,
321 F.3d 110, 122-24 (2003).  A New York court therefore "adjudicates" a federal ineffective-
assistance claim "on the merits" if it applies or simply cites Baldi.  Lopez, 323 F. Supp. 2d at
470, citing Eze, 321 F.3d at 123-24, and Lindstadt v. Keane, 239 F.3d 191, 198 (2d Cir. 2001).
The § 440 court's opinion, which cites Strickland and Baldi and applies the former to reject
Watkins's ineffective-assistance claim (Resp. Ex. 12 at 3-5), plainly qualifies as an adjudication
on the merits.  Accordingly, the Court may not grant Watkins's petition unless the state court's
decision disposing of this claim unreasonably applied Strickland to the facts of Watkins's case.
See Williams, 529 U.S. at 413.

The § 440 court denied petitioner's ineffective-assistance claim, finding that petitioner
had not "provide[d] the essential factual allegations" that counsel's conduct had prejudiced the
result of her trial.  (Resp. Ex. 12 at 5.)  It held that counsel's failure to "raise and develop a
'Payton' claim" based on petitioner's "warrantless arrest" did not prejudice petitioner because
she did not show "how and why" such a claim would have succeeded in obtaining a favorable
verdict.  (Id.)  However, petitioner contends that she received ineffective assistance of counsel
because, had her counsel raised a Payton claim, she could have suppressed the line-up
identification as the fruit of an illegal arrest and "the People would have been unable to establish

---

[8] According to Williams, "[u]nder the 'contrary to' clause, a federal habeas court may
grant the writ if the state court arrives at a conclusion opposite to that reached by th[e]
[Supreme] Court on a question of law or if the state court decides a case differently than this
Court has on a set of materially indistinguishable facts."  529 U.S. at 412-13.  The Second
Circuit has held that Baldi's conclusion on the question of law posed by an ineffective assistance
of counsel claim is not "opposite to that reached by" the Supreme Court in Strickland.  Lindstadt
v. Keane, 239 F.3d 191, 198 (2d Cir. 2001) ("The [Baldi] standard . . . is not 'diametrically
different, opposite in character or nature, or mutually opposed' to the standard articulated in
Strickland."), quoting Williams, 529 U.S. at 405.

an independent source upon which an in court identification could have been made" (id. 4), and therefore she would not have been convicted.

"There is a considerable irony to this claim."  Lopez, 323 F. Supp. 2d at 471.  Essentially, petitioner argues that the critical evidence underlying her conviction should have been excluded as the fruit of unlawful police conduct.  Yet, she cannot claim directly that the arrest, or the consequent admission of evidence, violated her federal constitutional rights, for such a claim is not cognizable on habeas.  See Stone v. Powell, 428 U.S. 465, 481 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.").  Nevertheless, petitioner's ineffective-assistance claim based on the failure of trial counsel to raise a Payton claim "remains cognizable on federal habeas."  Id. at 522.  The Sixth Amendment confers an independent right to the assistance of counsel in criminal cases.  See Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (rejecting "petitioner's perception of the identity between respondent's Fourth and Sixth Amendment claims" and observing that "[w]hile defense counsel's failure to make a timely suppression motion is the primary manifestation of incompetence and source of prejudice . . . , the two claims are nonetheless distinct, both in nature and in the requisite elements of proof").  The questions therefore remain whether petitioner's trial counsel's performance "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and whether "but for [that failure], the result of the proceeding would have been different."  Id. at 694.

In the context of an alleged failure to raise a Fourth Amendment claim, <u>Strickland</u> requires an analysis of the merits of that claim; if the claim would have prevailed, the Court must then ask whether "the verdict would have been different absent the excludable evidence" that was the fruit of the illegal arrest. <u>Kimmelman</u>, 477 U.S. at 375. Hence, insofar as Watkins bases her ineffective-assistance claim on counsel's failure to raise a <u>Payton</u> claim, she can prevail only if (1) a competent attorney would have raised a <u>Payton</u> claim, (2) that motion would have prevailed, and (3) the outcome of petitioner's trial would for that reason have differed.

D.      The <u>Payton</u> Claim

Petitioner claims that, had her trial counsel raised a <u>Payton</u> claim, the line-up identification would have been suppressed as the fruit of an illegal arrest. According to <u>Payton v. New York</u>, 445 U.S. 573 (1980), absent exigent circumstances or consent, "the police must obtain a warrant before entering a suspect's home to make a routine felony arrest." <u>Mosby v. Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), citing <u>Payton</u>, 445 U.S. at 589. Petitioner argues that her February 16 arrest was a violation of <u>Payton</u>. (Pet. ¶ 12(A).) Although petitioner does not dispute that the actual arrest took place in the hallway outside of her apartment (Donnelly Hr'g 61), she argues that because the police were "explicit" that she could not leave her apartment without being arrested, she was placed under a "constructive arrest" while she was inside her apartment, which she alleges amounts to a <u>Payton</u> violation. (Resp. Ex. 2 at 25-26.)

As an initial matter, petitioner's <u>Payton</u> claim is not supported by the case law, or by <u>Payton</u> itself. Petitioner argues that the police conduct in this case violated <u>Payton</u> because they "gave her no choice but to come out" of her apartment (Resp. Ex. 2 at 25); however, even if the police make it clear that a suspect cannot leave her home without being arrested, such conduct

-18-

does not implicate the concerns that motivated Payton.  Although such conduct might amount to a seizure under the Fourth Amendment, see Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968) (seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen"), Payton is not implicated simply because petitioner was technically "seized" while within her home.  Instead, Payton is implicated when the police "mak[e] a warrantless and nonconsensual *entry into a suspect's home* in order to make a routine felony arrest."  Payton, 445 U.S. at 586 (emphasis supplied).  See United States v. Gori, 230 F.3d 44, 51 (2d Cir. 2000) ("The Payton rule . . . is directed primarily at warrantless *physical* intrusion into the home.") (emphasis in original).

Although some courts in other circuits have found that Payton might apply where the police use an extreme degree of coercion or fraud in coaxing a suspect out of their home, see United States v. Morgan, 743 F.2d 1158, 1166 (6th Cir. 1984) and United States v. Johnson, 626 F.2d 753, 757 (9th Cir. 1980), the Second Circuit has never held that such conduct amounts to a Payton violation, see Gori, 230 F.3d at 51 (declining to address the issue), and other circuits have rejected such an application of Payton.  See United States v. Berkowitz, 927 F.3d 1376, 1387 (7th Cir. 1991) ("When the police assert from outside the home their authority to arrest a person, they have not breached the person's privacy interest in the home.").[9]

_____

[9] Moreover, the cases finding a Payton violation without entry are largely distinguishable, since the degree of "force" and "authority" used by the police in this case, consisting of phone calls and knocking on petitioner's door, does not come anywhere close to the degree used by the police in cases in which Payton was violated even without an actual entry into the suspect's home.  See Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997) (finding Payton violation where "SWAT team surrounds a residence with machine guns pointed at the windows and then persons inside are ordered to leave the house backwards with their hands raised"); Morgan, 743 F.2d at 1161, 1164-67 (finding Payton violation where police "flooded the house with spotlights and summoned [the suspect] . . . with the blaring call of a bullhorn").

As Payton itself makes clear, the Fourth Amendment interest at stake when the police enter a home without a warrant to make an arrest is not the warrantless seizure of the person. Such an arrest is permitted, when the police have probable cause, without a warrant.  What is problematic in the Payton scenario is the entry into and search of the home, a precinct specifically protected by the Fourth Amendment, without prior judicial approval.  Thus, the relevant inquiry for whether a warrantless arrest amounted to a Payton violation is not whether the police conduct constituted a "seizure" under the Fourth Amendment, but where the suspect was seized.  See Payton, 445 U.S. at 585-86 (characterizing the "chief evil" that Payton protects against to be "physical entry of the home"); see also New York v. Harris, 495 U.S. 14, 17 (1990) ("Payton was designed to protect the physical integrity of the home.").  In this case, there is no dispute that petitioner was arrested in the hallway outside of her apartment; by "submit[ting]" to the police's authority and exiting her apartment, petitioner "forfeited the privacy of [her] home." Berkowitz, 927 F.2d at 1387.  The police never breached the threshold of the home or observed any of its contents; they simply waited for Watkins to leave the home and enter the common hallway, where she was, legally, arrested.  Accordingly, because petitioner had no privacy interest in any space beyond "the entrance of [her] house," Payton, 445 U.S. at 590, Payton was not implicated by her arrest.

In any event, even assuming arguendo that petitioner's Payton claim had merit, petitioner's claim would still have to be rejected, as the injury claimed by petitioner resulting from the alleged Payton violation – the line-up identification – would not have been suppressed regardless of the merits of her Payton claim.  Neither the United States nor the New York State Constitution "require[s] the suppression of evidence of a lineup identification made after an

arrest based on probable cause but in violation of Payton." People v. Jones, 2 N.Y.3d 235, 244-45 (2004). See id. at 240 ("[U]nder the Fourth Amendment . . . evidence procured after the police leave an arrestee's residence is not considered to be 'the product of' a Payton violation."), citing New York v. Harris, 494 U.S. 14, 19 (1990). See, e.g., Harris, 494 U.S. at 18 (rejecting the argument that Payton "suggests that an arrest in a home without a warrant but with probable cause somehow renders unlawful continued custody of the suspect once he is removed from the house"). Cf. Mosby, 470 F.3d at 523-24 (distinguishing between *confessions* resulting from a Payton violation, which may be suppressed under the New York Constitution, and *line-up identifications* resulting from a Payton violation, which may not be suppressed under the New York Constitution), citing Jones, 2 N.Y.3d at 244-45, and People v. Harris, 77 N.Y.2d 434 (1991). Thus, even if the police violated Payton in this case, the line-up identification would not have been suppressed, as "the identification[] of defendant [was] not the 'product of' the Payton violation, but of the police having probable cause to believe that defendant was the perpetrator." Mosby, 470 F.3d at 524, citing Jones, 2 N.Y.3d at 243-44.[10]

---

[10] Although Jones was decided after petitioner's counsel allegedly waived or abandoned the Payton claim, the Supreme Court has held that current law should be applied retroactively for purposes of determining whether a party has demonstrated prejudice under Strickland's second prong. Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Compare United States v. Gaskin, 364 F.3d 438, 469 (2d Cir. 2004) ("In evaluating the performance prong of an ineffective-assistance claim, we do not view the challenged conduct through the 'distorting' lens of hindsight but 'from counsel's perspective at the time.'"), quoting Strickland, 466 U.S. at 689, with Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994) ("The outcome determination, unlike the performance determination, may be made with the benefit of hindsight."), citing Lockhart, 506 U.S. at 372-73.

Petitioner does not dispute that the police had probable cause to arrest her.[11]  The voice identification of petitioner by the cab dispatcher and the photo identification of petitioner by Tavares were not prompted by the officers' warrantless arrest of her, or by anything they discovered while inside the house.  Application of the exclusionary rule is not warranted in this case, since "the requisite connection between the violation of a constitutional right and the derivative evidence is absent."  Mosby, 470 F.3d at 524, citing Jones, 2 N.Y.3d at 242.

Thus, petitioner was not prejudiced by her counsel's failure to raise a Payton claim, and she therefore cannot satisfy the second prong of Strickland.  See Mosby, 470 F.3d at 524-25 ("[E]ven if [petitioner] could show that . . . counsel's failure to raise the suppression claim fell below an objective standard of reasonableness, [petitioner] cannot show that he was prejudiced by the omission.") (internal quotation marks omitted).  Accordingly, petitioner's claim of ineffective-assistance of counsel is denied.[12]

## III.  The Voice Identification Claim

Watkins next claims that the voice identification procedure employed by the police on January 22, 1995, violated her right to due process.  Specifically, Watkins argues that the state court's failure to suppress the voice identification was erroneous.  The District Attorney argues

---

[11] Although petitioner disputes the admissibility of the voice identification procedure that led to her arrest, see Discussion, Section III, infra, she does not dispute that the voice identification itself was sufficient to create probable cause for her arrest.

[12] Because the issue of whether Payton applies to petitioner's arrest raises a question about which the courts are not in agreement, a certificate of appealability would issue if this claim were disposed of based on this Court's conclusion that no Payton violation occurred.  However, because the law is clear that the line-up identification should not be suppressed regardless of whether Payton was violated, petitioner has not made a substantial showing of a violation of her constitutional right to the effective assistance of counsel, and the Court therefore declines to issue the certificate.

that the state court's resolution of the issue was neither contrary to nor an unreasonable application of Supreme Court precedent.  The Court agrees.

Prior to trial, New York Supreme Court Justice Robert H. Straus conducted a <u>Wade</u> hearing to determine whether the pre-trial identification comported with due process.  <u>See</u> <u>United States v. Wade</u>, 388 U.S. 218 (1968); <u>Pryor v. Connolly</u>, 460 F. Supp. 2d 530, 533 (S.D.N.Y. 2006).  At the <u>Wade</u> inquiry, petitioner argued that the voice identification procedure used by the police was "inherently suggestive," and that the police "were required to provide . . . a choice of several voices to over-hear . . . from which to choose a recognized voice."  (Resp. Ex. 15 at 10.) However, Justice Straus found that the dispatcher who identified petitioner was "sufficiently familiar" with petitioner's voice "to render her identification . . . confirmatory in nature," and that the procedure therefore was not unduly suggestive.  (<u>Id</u>. 12.)  Justice Straus's thorough and detailed opinion was affirmed by the Appellate Division.  733 N.Y.S.2d at 71.

As discussed above, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Under the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13.  Under the "unreasonable

application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  See Jones v. Stinson, 229 F.3d 112, 119-21 (2d Cir. 2000) (holding that a writ may not issue even where the state court is incorrect, as long as the state court is not unreasonable).  Determination of factual issues made by a state court "shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The Supreme Court has not ruled on the propriety of the confirmatory voice identification procedure used by the police in this case; thus, petitioner cannot argue that the state courts' decision was contrary to Supreme Court precedent.  However, the Supreme Court has ruled on the general due process boundaries of pre-trial identifications; the question presented is thus whether the state courts' resolution of this case was an unreasonable application of those principles.

A pre-trial identification is only inadmissible as unduly suggestive if it was so unreliable as to raise "a very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116 (1977).  Thus, the admission of testimony concerning a suggestive identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability. Id. at 114.  Moreover, "[e]ven an impermissibly suggestive pre-trial identification procedure does not render an identification inadmissible in court if, considering the totality of the circumstances, there is sufficient evidence of reliability apart from the tainted identification." Ortiz v. Artuz, 113 F. Supp. 2d 327, 337 (E.D.N.Y. 2000).  If there is such evidence, "the identification is admissible independent of the suggestive nature of the

pretrial identification." Id., citing Manson, 432 U.S. 98; Neil v. Biggers,  409 U.S. 188 (1972).

See Dickerson v. Fogg, 692 F.2d 238, 244 (2d Cir. 1982) ("Even grossly suggestive procedures

will not require suppression of a witness'[s] identification testimony if it is clearly reliable,

independent of improper procedures.") (citation and internal quotation marks omitted).  Five

factors to be considered as independent indicia of the reliability of a witness's identification are:

(1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's

degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the

level of certainty demonstrated at the confrontation; and (5) the time elapsed between the crime

and the confrontation.  Manson, 432 U.S. at 114.  In addition, prior familiarity of the witness

with the accused is an important indication of the reliability of the pre-trial identification.  See

Ortiz, 113 F. Supp. 2d at 337.  Accord Minetos v. Scully, 625 F.Supp. 815, 819 (S.D.N.Y. 1986).

Justice Straus' decision, as affirmed by the Appellate Division, was not an "unreasonable

application" of the relevant Supreme Court precedents.  The voice identification procedure used

in this case did not raise a "likelihood of irreparable misidentification" and was significantly

reliable.  First, Justice Straus found that the cab dispatcher was already familiar with petitioner's

voice.  (Resp. Ex. 15 at 12.)  The Court may not disturb the state court's finding of prior

familiarity, as petitioner has presented no evidence that contradicts that finding, and there is

ample evidence in the record supporting it.  (See Tr. 681.)  In fact, petitioner admitted during her

Grand Jury testimony that *she* recognized the *dispatcher's* voice.  (Resp. Ex. 14 at 21.)

Moreover, the procedure itself sought to ensure that the dispatcher would not be subject

to undue suggestion.  She was not told that petitioner would be calling (Tr. 690), and the

dispatcher did not see petitioner at the station house.  (Id. 710.)  In addition, the dispatcher was

not equivocal about the identification; she recognized petitioner's voice immediately upon hearing it.  (Id. 692 (stating that the dispatcher was "[a] hundred percent" certain of the identification).)  Finally, very little time elapsed between the January 19 murder and the January 22 identification.  Thus, Justice Straus' determination that the voice identification procedure complied with due process was not an unreasonable application of Supreme Court precedent.

IV.  The Prosecutorial Misconduct Claim

Watkins next claims that the prosecutor engaged in various misconduct during her trial. Specifically, Watkins claims that the prosecutor improperly elicited testimony about (1) her pre-trial incarceration and (2) her boyfriend, Andrew Peters.  The District Attorney argues that the latter claim is precluded from habeas review because the state court rejected it on an independent and adequate state ground, while the former claim is not cognizable upon habeas review because it only involves issues of state law.  Petitioner's claim will be denied.

A.      Petitioner's Pre-Trial Incarceration Testimony

Petitioner's pre-trial incarceration was revealed during cross-examination.  In response to a question posed by the prosecutor, petitioner stated that she had last seen her boyfriend when he visited her on Rikers Island.  (Id. 1355.)  During the ensuing colloquy, the prosecutor explained that he had expected petitioner to answer that she had last seen Peters in the courtroom, and that the answer of "Rikers Island" was unexpected.  (Id. 1368.)  After a mistrial motion was denied (id. 1369-70), the state court agreed to give petitioner's requested curative instruction that, although petitioner was in custody, that fact was irrelevant to whether she was guilty or not guilty.  (Id. 1374-74, 1449-52.)

Petitioner argues that the instruction was not enough to eliminate the "pink elephant" created by her testimony from improperly influencing the jury (id. 1375), and that, by providing the jury with information about her pre-trial detention, she was deprived of her due process right to a fair trial.  (Pet. Mem. 22.)  The District Attorney argues that "[t]he Supreme Court has made clear that it is not the province of federal habeas courts to pass upon the propriety of state court evidentiary rulings."  (Resp. Mem. 17, citing Estelle v. McGuire, 502 U.S. 62, 75 (1991).)  This is an accurate statement of the law insofar as it generally applies to applications of *state* law to evidentiary rulings.  But it is undeniably the province of federal habeas courts to determine whether the evidentiary ruling "violated [petitioner's] *federal* constitutional rights."  Estelle, 502 U.S. at 68 (emphasis supplied).

When a petitioner seeks habeas relief on the basis of erroneously admitted evidence, a writ can issue only if the erroneously admitted evidence rendered the trial fundamentally unfair.  See Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983), citing Chambers v. Mississippi, 410 U.S. 284, 302-303 (1973); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985).  The standard for determining whether a petitioner has been denied a fair trial by an alleged evidentiary error in state court is "whether the erroneously admitted evidence, viewed objectively in the light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove reasonable doubt that would have existed on the record without it."  Collins, 755 F.2d at 19.

Judged by this standard, petitioner's claim is without merit.  The inadvertent reference to petitioner's incarceration at Rikers Island was brief and was subject to a prompt curative instruction.  The prosecutor did not intentionally elicit such testimony, believing instead that

petitioner had last seen Peters in court.  (Tr. 1368, 1452.)  Moreover, the reference to petitioner's detention was not emphasized to the jury in any way.  The prosecutor did not inquire into any other circumstances surrounding petitioner's incarceration, the line of questioning was immediately abandoned, and the prosecutor did not refer to the subject in summation.  See United States v. Castano, 999 F.2d 615, 618 (2d Cir. 1993) (finding that erroneously admitted evidence in the case was "extremely unlikely" to have "contributed to the guilty verdict," as the "introduction of the evidence was inadvertent" and "the prosecution did nothing to emphasize the statements at the time they were made, and never referred to them thereafter").

Nor was the instruction itself insufficient to cure whatever due process concerns that arose from petitioner's testimony.  The jurors were instructed that petitioner's incarceration was "irrelevant to whether she [was] guilty or not guilty of the crime or crimes charged.  It is thus not a fact for which any inference unfavorable to the Defendant or to the People may be drawn." (Tr. 1617.)  Jurors are presumed to follow such instructions unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, Richardson v. Marsh, 481 U.S. 200, 211 (1987), and a strong likelihood that the effect of the evidence would be "devastating" to the defendant.  Bruton v. United States, 391 U.S. 123, 136 (1968).  There was no significant probability that the jury would be unable to understand the court's simple, clear instruction, and in any event, the reference to petitioner's incarceration was so brief that it is unlikely that it had a "devastating" effect on petitioner.  See, e.g., Castano, 999 F.2d at 618 (holding that the inadvertent admission of two items of evidence regarding weapons did not violate defendant's rights because the court ordered that the admission be stricken); Roldan v. Artuz, 78 F. Supp. 2d 260, 280 (S.D.N.Y. 2000) (holding that even if testimony produced

inadmissible evidence of uncharged crimes, the trial court's "prompt curative instructions to the jury eliminated the risk of unfair prejudice").

B.      Petitioner's Testimony Concerning Andrew Peters

During trial, the prosecutor elicited testimony from petitioner and from defense witness Tolentino concerning petitioner's boyfriend, Andrew Peters.  The testimony primarily concerned Peters's reputation as a drug dealer and cab robber (Tr. 1190, 1342) and his use of an alias.  (Id. 1341, 1344).  During summation, the prosecutor argued that Peters was the "male voice" who had instructed Watkins to order the cab, asserting that Peters was the mastermind behind the crime.  (Id. 1585.)  Petitioner argues that these references to Peters were improper because "[a] defendant may not be convicted on the basis of another's guilt or bad acts."  (Pet. Mem. 21, citing Krulewitch v. United States, 336 U.S. 440, 454 (1949) (Jackson, J., concurring).)

The District Attorney again argues that this Court is barred from considering petitioner's prosecutorial misconduct claim; here, the District Attorney argues that the Court is precluded from reviewing petitioner's claim because the Appellate Division had found that petitioner failed to object to certain instances of prosecutorial misconduct.  733 N.Y.S.2d at 71.  Thus, the District Attorney argues that the Appellate Division rejected petitioner's claim on the "independent and adequate state procedural bar of preservation."  (Resp. Mem. 10.)

Federal habeas review of a claim is generally prohibited if a state court rests its judgment on an independent and adequate state ground.  See Lambrix v. Singletary, 520 U.S. 518, 522-23 (1997); Coleman v. Thompson, 501 U.S. 722, 729 (1991); Jones v. Vacco, 126 F.3d 408, 414 (2d Cir. 1997).  A state procedural default qualifies as an independent and adequate state ground where "the last state court rendering a judgment in the case clearly and expressly states that its

judgment rests on a state procedural bar." Levine v. Comm'r of Correctional Servs., 44 F.3d 121, 126 (2d Cir. 1995), quoting Harris v. Reed, 489 U.S. 255, 263 (1989).  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) (finding that where the last "reasoned" opinion on the claim explicitly imposes the procedural bar, it will be presumed that later unexplained orders upholding that opinion or rejecting that same claim did not silently disregard that bar and consider the merits).

The "independent and adequate" state ground relied on by the Appellate Division in this case was New York Criminal Procedure Law § 470.05.  Under § 470.05, a party may not appeal a ruling or instruction of the trial court unless the party objected to the ruling or instruction "when the court had an opportunity of effectively changing" it.  N.Y. Crim. Proc. Law § 470.05(2) (the "contemporaneous objection rule").  Thus, if petitioner did not adequately challenge the prosecutor's questions at trial, then this Court is precluded from reviewing petitioner's claim.  See Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996).

The District Attorney argues that the Appellate Division relied on § 470.05 to reject petitioner's claim of prosecutorial misconduct, and therefore this Court is precluded from reviewing that claim.  However, "[t]he adequacy of state procedural bars to the assertion of federal questions . . . is not within the State's prerogative finally to decide; rather adequacy is itself a federal question."  See Lee, 534 U.S. at 375 (internal quotation marks omitted).  Thus, the question of whether an alleged state procedural ground is independent and adequate is itself a federal question which the habeas court must consider.  See Cotto v. Herbert, 331 F.3d 217, 219 (2d Cir. 2003).

There is no dispute that § 470.05 represents an "independent" state law ground for

rejection of petitioner's claim; the only question is whether that ground was "adequate" in this

case.  Whether the state court's finding was adequate is contingent on whether there was a "fair

and substantial" basis in state law for such a finding.  Garcia, 188 F.3d at 77-78.  Here, there

unquestionably was.

Section 470.05 "require[s], at the very least, that any matter which a party wishes the

appellate court to decide have been brought to the attention of the trial court at a time and in a

way that gave the latter the opportunity to remedy the problem and thereby avert reversible

error."  People v. Luperon, 85 N.Y.2d 71, 78 (1995).  The Appellate Division correctly rejected

petitioner's prosecutorial misconduct claim, holding that her "various other claims of

prosecutorial error are unpreserved and we decline to review them in the interest of justice."  733

N.Y.S.2d at 71.  Petitioner neither absolutely nor substantially complied with the

contemporaneous objection rule; indeed, defense counsel never objected to the prosecutor's

elicitation of testimony regarding Andrew Peters from either Tolentino or petitioner.  Although

defense counsel did object to the missing witness charge, see Part VI infra, and to the

prosecutor's assertion during summation that Peters might have masterminded the crime (Tr.

1585),[13] defense counsel never objected during either Tolentino's or petitioner's cross-

_____

[13] To the extent the Court may consider the merits of petitioner's argument insofar as it
pertains to the prosecutor's comments about Peters during summation, petitioner's argument
fails.  A prosecutor's statements in summation constitute misconduct only when they are
egregious and cause actual prejudice.  Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998).
Although it is improper for the prosecution to mischaracterize evidence, refer in summation to
facts not in the record of trial, or give his own opinion as to the veracity of testimony, People v.
Bailey, 58 N.Y.2d 272 (1983), fleeting comments are not enough to overturn a conviction.
Tankleff, 135 F.3d at 253.  Any reasonable reading of the record in this case reveals that the
prosecutor made few, if any, potentially prejudicial comments, and that such comments were

examination to the prosecutor's various questions about Peters and petitioner's relationship with him.  (See, e.g., id. 1341-51.)  In fact, defense counsel specifically consented to a question about Peters proposed by the Court for the prosecutor to ask petitioner.  (Id. 1353.)  Thus, the trial court was not given the opportunity to remedy any error posed by the prosecutor's questioning; indeed, given defense counsel's explicit acquiescence to the prosecutor's line of questioning, the trial court could not have been aware of any supposed "reversible error."

Accordingly, the Appellate Division's finding was entirely consistent with the state case law on the contemporaneous objection rule, see People v. Bowen, 50 N.Y.2d 915, 917 (1980) (challenge to propriety of cross-examination of defendant was not preserved by timely protest); People v. Dawson, 50 N.Y.2d 311, 324 (1980) (objections were insufficient to preserve question for appellate review when defense did not express dissatisfaction with court's ruling on cross-examination); People v. Nesbit, 693 N.Y.S.2d 25, 25 (1st Dep't 1999) (challenges to cross-examination and summation were unpreserved), and petitioner's claim is procedurally defaulted.

Finally, petitioner's procedural default cannot be excused.  A procedural default may be excused if petitioner can show "cause for the procedural default *and* prejudice resulting therefrom."  Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991) (emphasis supplied), citing Murry v. Carrier, 477 U.S. 478, 492 (1986) and Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977).  However, petitioner has not provided any reason for defense counsel's failure to contemporaneously object to the prosecutor's conduct; thus, the Court need not consider whether

---

"fleeting."  Moreover, defense counsel did not even object to the prosecutor's statement that petitioner was "living off a drug dealer named Andrew Peters."  (Tr. 1590).  The "brevity" of these comments, to which defense counsel only partially objected – combined with the lack of prejudice to petitioner – establishes that the prosecutor's summation did not constitute misconduct.

counsel's failure to object to the conduct resulted in prejudice to petitioner, <u>Murray</u>, 477 U.S. at 494, and the default cannot be excused on this ground.

A procedural default may also be excused if the alleged errors have caused a "fundamental miscarriage of justice," even if petitioner cannot show "cause and prejudice." <u>Washington v. James</u>, 996 F.2d 1442, 1447 (2d Cir. 1993), citing <u>Murray</u>, 477 U.S. at 495-96. However, such an "extraordinary case" only occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Washington</u>, 966 F.2d at 1447 (citation and internal quotation marks omitted). Petitioner has the burden of demonstrating that she is "actually innocent" by showing that there is "a fair probability that . . . the trier of the facts would have entertained a reasonable doubt of [her] guilt." <u>Lebron v. Mann</u>, 40 F.3d 561, 564 (2d Cir. 1994), quoting <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 455 n.17 (1986). Considering the possible disruptive effect of such claims on the finality of criminal cases and the burden such claims place on states to retry cases based on stale evidence, the threshold for such a showing is "extraordinarily high." <u>Herrera v. Collins</u>, 506 U.S. 390, 417 (1993). Without the production of new, exculpatory evidence, "even the existence of a concededly meritorious constitutional violation is not itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." <u>Schlup v. Delo</u>, 513 U.S. 298, 316 (1995). <u>See id</u>. at 329 ("[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.").

Thus, in order to succeed in overcoming the procedural default, petitioner must show "new" evidence that could "persuade" the Court to determine that the jury could not have

reasonably found her guilty.  However, petitioner has not introduced any new, exculpatory

evidence.  (See Pet. Mem. 26 (claiming that the "case against [petitioner] was weak," but not

providing any new evidence).)  Instead, petitioner's arguments are merely restatements of

arguments she already made before, during, and after trial.  Because petitioner does not argue

that new evidence establishes that she was "actually innocent," the procedural default cannot be

excused.  See, e.g., Paulino v. United States, No. 97 Civ. 2107, 1998 WL 214877, at *4

(S.D.N.Y. Apr. 28, 1998) (characterizing "unsupported conclusory assertions of . . . innocence"

as "insufficient" to grant a habeas petition).

V.  The Improper Exclusion of Evidence Claim

      Petitioner next claims that the trial court improperly precluded her from introducing an

audiotape at trial.  Petitioner claims that Tavares, the state's "sole witness," admitted in the

audiotaped conversation that "she was shown a single photo by [the] detective rather than an

array."  (Pet. ¶ 12(D).)  The District Attorney argues that the state court properly excluded the

evidence, and in any event, that any error created by the exclusion was harmless.  The Court

agrees.

      Joseph Lisi, an investigator hired by petitioner, testified that he interviewed Tavares, and

that she told him that she had viewed only one photograph of a female, rather than several, as the

state's witnesses had testified.  (Tr. 1188-89.)  On cross-examination, the prosecutor did not

challenge Lisi's assertion that Tavares had told him that she viewed only a single photograph.

Subsequently, on redirect, petitioner moved to introduce a portion of an audiotape of Lisi's

conversation with Tavares concerning the single photograph.  (Id. 1249-54, 1269.)  However,

since Lisi's testimony regarding Tavares's statement had not been challenged, the trial court

denied petitioner's application, stating that "[t]here's no need to offer the tape at that point.  You

chose to have the witness testify to his conversation with her whether he was recording it or not.

He testified that she said it was one photograph, and there is no reason now to play the tape.

There is no claim that the tape says anything different from that."  (Id. 1269.)  The Appellate

Division affirmed the trial court's ruling, holding that "[t]he court properly exercised its

discretion in precluding [petitioner] from introducing an audiotape as cumulative to other

evidence.  Preclusion of the tape could not have caused any prejudice and did not deprive

[petitioner] of a fair trial or the right to present a defense."  733 N.Y.S.2d at 72 (citation

omitted).

       Petitioner argues that the Appellate Division's holding was "illogical and finds no

support in the record."  (Pet. Mem. 28.)  Specifically, petitioner argues that "the question of

whether Tavares was initially shown a photo array or a single photo was a matter of sharp

dispute."  (Id.)  Moreover, because the prosecutor had attacked the investigator's credibility,

petitioner argues that "[t]he tape was in no sense cumulative."  (Id.)  Finally, petitioner argues

that the error was not harmless because the photo identification was "suggestive" and there was a

"substantial probability that admission of the tape would have created an otherwise non-existent

reasonable doubt."  (Id. 29 (citation and internal quotation marks omitted).)

       The right to present a defense is "one of the minimum essentials of a fair trial."  Rosario

v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988), quoting Chambers, 410 U.S. at 294.  Although

the right to present a defense includes the right to submit evidence "to contradict or explain the

opponent's case," Taylor v. Illinois, 484 U.S. 400, 410-11 (1988), this right is not unlimited; a

trial court may place restrictions on a defendant's presentation of evidence without offending the

Constitution, so long as those restrictions serve "'legitimate interests in the criminal trial process' . . . and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992), quoting Rock v. Arkansas, 483 U.S. 44, 55-56 (1987).  Furthermore, the Supreme Court has been reluctant to impose restraints on ordinary evidentiary rulings by state courts, as the "power of courts to exclude evidence through the application of evidentiary rules . . . serve[s] the interests of fairness and reliability." Zarvela v. Artuz, 364 F.3d 416, 418 (2d Cir. 2004), quoting Wade v. Montello, 333 F.3d 51, 58 (2d Cir. 2003).  See Almonte, 956 F.2d at 30 (denying defendant "carte blanche to circumvent the rules of evidence" by invoking the right to present a defense).  Thus, the relevant inquiry for the habeas court is whether "the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness." Rosario, 839 F.2d at 924.

The state trial court did not commit constitutional error in precluding admission of the audiotape.  First, petitioner has not shown that the court's ruling was contrary to New York's cumulative evidence rule.  The cumulative evidence rule precludes a party from introducing evidence of "collateral matters having little or no bearing on the guilt or innocence of the defendant." People v. Aska, 91 N.Y.2d 979, 981 (1998).  Although the tape might have supported Lisi's credibility, evidence that "merely bolster[s]" a defendant's case may be properly excluded under the cumulative evidence rule, as long as such evidence is not "material" to the case.  Id.  The audiotape was not "material" to petitioner's case; the defense elicited without any challenge from the prosecutor that Tavares told Lisi that she viewed a single photograph of petitioner – thus, introduction of the evidence on redirect was neither required nor appropriate under "the particular circumstances of this case." Id.  That the prosecutor might

have sought to discredit Lisi in other areas did not render exclusion of the audiotape unconstitutional; the relevant inquiry is whether the trial court's ruling was "objectively unreasonable" considering the "marginal[] relevan[ce]" of the tape.  Wade, 333 F.3d at 60.  As the trial court properly applied the cumulative evidence rule, which is entirely consistent with Supreme Court precedent, the Court cannot find that the trial court's determination was "objectively unreasonable."  See Crane v. Kentucky, 476 U.S. 683, 689 (1989) ("[T]he Constitution leaves to the [trial court] judges . . . wide latitude to exclude evidence that is repetitive . . . .") (citation and internal quotation marks omitted).

Furthermore, any error in precluding the audiotape was harmless.  See Benn v. Greiner, 402 F.3d 100, 106 (2d Cir. 2005) (in determining whether an error was "harmless," the reviewing court should assess, inter alia, "the presence or absence of evidence . . . contradicting the testimony of the witness, . . . the extent of cross examination otherwise permitted, and . . . the overall strength of the prosecution's case"), quoting Cotto, 331 F.3d at 254.  The trial court gave petitioner the opportunity to question Lisi about the photo identification, and Lisi's testimony was not challenged on that issue during cross-examination.  Moreover, petitioner stressed repeatedly in summation that Tavares viewed only one picture, rather than a photo array.  (Tr. 1479, 1487, 1489, 1494-96, 1499.)  Furthermore, defense counsel informed the jury during summation that Lisi recorded his conversation with Tavares.  (Id. 1499.)  Finally, the prosecutor did not argue in summation that Lisi had lied about the conversation between himself and Tavares; instead, the prosecutor treated the issue as irrelevant to petitioner's guilt.  (Id. 1582 ("Now, I don't know what's up with the photographs, five, one, doesn't matter.").).  Thus, the prosecutor never contradicted Lisi's testimony on this point, either during cross-examination or

in his summation, nor did the prosecutor urge the jury to discredit or disbelieve Lisi's testimony on this point.  Accordingly, any potential error in excluding the tape was harmless.

VI.  The Missing Witness Charge Claim

Petitioner next claims that the missing witness instruction given by the trial court was improper, and violated her right to a fair trial.  The District Attorney argues that the trial court acted within its discretion to issue a missing witness charge, and did not unreasonably apply clearly established federal law.  The Court agrees.

At trial, petitioner testified that she was at home with her boyfriend Andrew Peters at the time of the crime, and that she had never been to the scene of the crime.  (Id. 1325-26.) Petitioner acknowledged that she had previously named Peters as her alibi witness.  (Id. 1348.) Nevertheless, petitioner did not call Peters as a witness, and the prosecutor requested a missing witness charge.  Defense counsel objected to the charge on the grounds that Peters's criminal record was "egregious" and that calling him would prejudice petitioner on a "guilt by association" theory.  (Pet. Mem. 23; see Tr. 1381.)  The trial court rejected this argument, finding that Peters's "prior history" did not excuse petitioner's failure to call him.  (Tr. 1390.) Petitioner claims that the missing witness charge violated her right to a fair trial.

A trial court's decision to deliver a missing witness instruction, like any jury instruction, "does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the [decision] so infected the entire trial that the resulting conviction violated due process." Nieves v. Fischer, No. 03 Civ. 9803, 2004 WL 2997860, at *8 (S.D.N.Y. Dec. 28, 2004), quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977).  See Reid v. Senkowski, 961 F.2d 374, 377 (2d Cir. 1992) (habeas relief may be granted if petitioner can show that the missing witness charge

-38-

deprived her of her constitutional right to a fair trial).  Generally, a state trial court's decision to give a missing witness charge is a matter of state law.  See Castro v. Fisher, No. 04 Civ. 0346, 2004 WL 1637920, at *17 (S.D.N.Y. July 23, 2004).  "'Whether a missing witness charge should be given lies in the sound discretion of the trial court.'"  Reid, 961 F.2d at 377, quoting United States v. Torres, 845 F.2d 1165, 1170-71 (2d Cir. 1988).  A trial court's decision in this area will rarely support habeas relief, as habeas courts recognize "the usual aura of gamesmanship that frequently accompanies requests for a missing witness charge as to which the trial judge will have a surer sense" than any reviewing court.  Torres, 845 F.2d at 1171 (internal quotation marks omitted).  See United States v. Erb, 543 F.2d 438, 445 (2d Cir. 1976) ("Eminent authority suggests caution in developing elaborate rules of law defining the circumstances when the right [] to a missing witness charge [] exists.") (citation and internal quotation marks omitted).

A party is entitled to a missing witness charge when the opposing party fails to call a material witness who would be expected to testify favorably for the opposing party, and over whom the opposing party has control.  See People v. Gonzalez, 68 N.Y.2d 424, 427 (1986).  The party seeking the missing witness charge must sustain an initial burden of showing that the opposing party has failed to call the witness.  See People v. Macana, 84 N.Y.2d 173, 177 (1994).  The burden then shifts to the opposing party "to account for the witness'[s] absence or otherwise demonstrate that the charge would not be appropriate," by, inter alia, "demonstrating . . . that the witness is not 'available,' or that the witness is not under the party's 'control' such that he would not be expected to testify in" the party's favor.  Id., citing Gonzalez, 68 N.Y.2d at 428.

The District Attorney argues that petitioner had "control" over Peters, and, given that petitioner's alibi was that she was home with Peters on the night of the crime, Peters reasonably

would have been expected to testify for petitioner at trial.  However, petitioner claims that her failure to call Peters should have been excused, and therefore the missing witness charge was improper.  Petitioner relies on two arguments to support her claim.

First, petitioner argues that, according to Macana, a missing witness charge is "inappropriate . . . where the uncalled witness is alleged to be an accomplice, even if uncharged, since such a witness is unlikely to testify even if called, and thus not under defense's control." (Pet. Mem. 23, citing Macana, 84 N.Y.2d 173.)  However, this exception is only available in cases where the missing witness is likely to invoke the Fifth Amendment and refuse to testify. See Macana, 84 N.Y.2d at 177-78.  In order to avail herself of this exception, petitioner was required to show some verification, through an in camera examination of the witness, that Peters would have, in fact, refused to testify.  (Tr. 1385.)  See Macana, 84 N.Y.2d at 179-80.  While verification may be unnecessary where the prosecution's own evidence establishes the existence of the witness and his involvement in the crime, id. at 178, notwithstanding a brief allusion to Peters's directing petitioner to call for a cab during summation (Tr. 1585), the prosecution in this case did not present any evidence of Peters's involvement in the crime.  Instead, the prosecution's evidence pertaining to Peters bore almost entirely on his status as Watkins's alibi, and not on his status as an alleged accomplice. Similarly, the charge itself focused entirely on Peters's status as Watkins's alibi and not as an alleged accomplice.  (Compare United States v. Pitts, 918 F.2d 197 (D.C. Cir. 1990) (finding a missing witness charge to be inappropriate where the missing witness was alleged to be "jointly" involved in the crime and the defense testimony "implicat[ed] him in the offenses"), with Tr. 1637 (stating that the jury could consider petitioner's failure to call Peters as far as it pertained to the "issue of [her] whereabouts" on the

-40-

night of the crime).)  Thus, because Peters did not verify that he would refuse to testify,

petitioner's failure to call him as a witness may not be excused on this ground.  See Macana, 84

N.Y.2d at 178 (cautioning against refusing a missing witness charge because failure to issue such

a charge may allow the defendant to "fabricate[]" a defense and "shift[] criminal responsibility to

the uncalled witness").

Second, petitioner argues that, because Peters allegedly has an extensive criminal record,

the trial court should have excused petitioner's failure to call him, as his testimony would have

been highly susceptible to impeachment.  Under New York law, when "a witness has an

extensive record of prior convictions, and will, therefore, be prejudicially vulnerable to

damaging impeachment," the court may excuse the non-charging party's failure to call the

witness and deny the missing witness charge.  People v. Rodriguez, 38 N.Y.2d 95, 101 (1975).

However, whether to excuse the party's failure on this ground is entirely within the court's

discretion.  In this case, the trial court found that Peters's criminal history was only relevant to

his "credibility and not beyond that."  (Tr. 1390.)  Thus, the trial court found that Peters's record

would not "create . . . a picture for the jury of prior criminal activity that the jury would be

unable to separate in their minds the witness'[s] prior history from the defendant on trial."  (Id.)

Considering the trial court's extensive consideration of Peters's prior convictions (id. 1386-90),

the Court cannot say that it was an abuse of the trial court's discretion to grant the missing

witness charge, notwithstanding Peters's criminal record.

## VII.  The Line-up Identification Claim

Petitioner next claims that the line-up identification was the fruit of an illegal arrest, and

therefore should have been suppressed at trial as a violation of the Fourth Amendment.

However, habeas relief is unavailable on petitioner's claim because she was afforded an opportunity for a full and fair litigation of the issue before the state courts.

It is axiomatic that a habeas court may not grant relief regarding a Fourth Amendment claim if the petitioner was afforded an opportunity for a full and fair litigation of the issue before the state courts.  Stone, 428 U.S. at 480-81.  Although "the federal intrusion may still be warranted" if "the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process," Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977), citing Frank v. Mangum, 237 U.S. 309 (1915), the habeas court cannot grant relief simply because it may disagree with the state court's resolution of the claim.  See Foran v. Mertz, 463 F.Supp. 1088, 1092-93 (S.D.N.Y. 1979), aff'd, 603 F.2d 212 (2d Cir.). Instead, collateral review of Fourth Amendment claims in habeas petitions is only appropriate in one of two instances: (1) if the state provides no corrective procedures at all to redress Fourth Amendment violations; or (2) where the state provides the process but in fact the defendant is precluded from using it by reason of an unconscionable breakdown in that process.  Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

New York clearly affords the requisite corrective procedures to redress Fourth Amendment challenges.  N.Y. Crim. Proc. Law § 710.10 et seq. (permitting a criminal defendant to file a pre-trial motion to suppress any evidence unlawfully seized).  The courts in this circuit have expressly approved New York's procedure for litigating Fourth Amendment claims as being facially adequate.  See Capellan, 975 F.2d at 70 n.1, quoting Holmes v. Scully, 706 F.Supp. 195, 201 (E.D.N.Y. 1989); see also Gates, 568 F.2d at 836 n.4.  Here, petitioner used the available corrective procedures when she moved to suppress evidence derived from her January

21 detention, arguing that the detention was a de facto arrest.  (Resp. Ex. 15 at 7-10.)  Although

the trial court found that petitioner's detention was a de facto arrest, it nevertheless rejected

petitioner's argument that the evidence should be suppressed.  Petitioner reiterated that argument

on appeal and it was rejected by the Appellate Division.  733 N.Y.S.2d at 71.  She raised the

argument again to the New York Court of Appeals, but leave to appeal was denied.  98 N.Y.2d

703.  There was no "breakdown" in the process, unconscionable or otherwise; petitioner had

"full" opportunity to avail herself of New York's corrective procedures, and she did so.

Martinez v. Miller, No. 01 Civ. 2921, 2001 WL 1382586, at *1 (S.D.N.Y. Nov. 6, 2001).

Accordingly, petitioner's claim is denied.

VIII. The Rosario Claim

       Petitioner next claims that the trial court improperly failed to order the prosecution to

disclose alleged Rosario material.  Rosario requires prosecutors in New York to "make available

to the defendant . . . any written or recorded statement . . . made by a person whom the

prosecutor intends to call as a witness at trial, and which relates to the subject matter of the

witness testimony."  People v. Rosario, 9 N.Y.2d 286 (1961), as codified in N.Y.C.P.L. §

240.45(1)(a).  The Rosario claim, however, is a state law claim that is not cognizable on habeas

review.  See Landy v. Costello, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768, at *1 (2d

Cir. Mar. 9, 1998) (Rosario obligations arise solely under state law); Pena v. Fischer, No. 00 Civ.

5984, 2003 WL 1990331, at *10 (S.D.N.Y. Apr. 30, 2003) ("[F]ederal courts have consistently

held that Rosario claims are not subject to federal habeas corpus review because they arise

exclusively under state law.") (alteration in original) (citation and internal quotation marks

omitted); Green v. Artuz, 990 F.Supp. 267, 274 (S.D.N.Y. 1998) ("[F]ailure to turn over Rosario

material is not a basis for habeas relief as the <u>Rosario</u> rule is purely one of a state law.") (citation

omitted).  Accordingly, petitioner's <u>Rosario</u> claim is denied.

IX.  <u>The Excessive Sentence Claim</u>

Finally, petitioner argues that her sentence was unconstitutionally excessive.[14]  Since

petitioner's sentence was within the legal limits set by statute, <u>see</u> N.Y. Penal Law § 70.00(2)(a),

(3)(a)(I), her excessive sentence claim must be denied.  "No federal constitutional issue is

presented where, as here, the sentence is within the range prescribed by state law."  <u>White v.</u>

<u>Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992).  The only federal constitutional basis for objecting

to the state legislative determinations of appropriate criminal penalties is the Eighth

Amendment's Cruel and Unusual Punishments Clause, <u>Martinez</u>, 2001 WL 1382586, at *1, and

a 25-year to life sentence for murder "comes nowhere close to raising an issue under the

Supreme Court's case law regarding that clause."  <u>Id</u>., citing <u>Harmelin v. Michigan</u>, 501 U.S.

957 (1991) (life without parole for first offense possession of 672 grams of cocaine not cruel and

unusual punishment) and <u>Solem v. Helm</u>, 463 U.S. 277 (1983) (life without parole for uttering

$100 bad check with three prior convictions for non-violent property crimes violates Eighth

Amendment).  <u>See</u>, <u>e.g.</u>, <u>Dorszynski v. United States</u>, 418 U.S. 424, 431 (1974) (where the

record reveals that "a sentence is within the limitations set forth in the statute under which it is

imposed, appellate review is at an end").  Accordingly, petitioner's excessive sentence claim is

denied.

---

[14] The habeas petition does not specifically include an excessive sentence claim.
However, the petition incorporates "the same grounds" that were raised on direct appeal,
presumably including the excessive sentence claim.  (Pet. Supplemental Ans.)

## CONCLUSION

For the reasons stated, Watkins's petition for a writ of habeas corpus is denied.

Petitioner has not made a substantial showing of the denial of a constitutional right; accordingly, a certificate of appealability is denied.  <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Lucidore v. N.Y. State Div. of Parole</u>, 209 F.3d 107, 111-13 (2d Cir. 2000).


SO ORDERED.

Dated: New York, New York
       May 7, 2007

                                        _____
                                            GERARD E. LYNCH
                                            United States District Judge